**United States District Court**

**Eastern District of Tennessee**

**Chattanooga Division**

Harold Hempstead                                    Case No.:

Plaintiff

V.

Tennessee Department of Corrections,

Frank Strada

Brett Cobble

Defendants

## Civil Rights Complaint and Jury Demand

This is a civil action for monetary damages and injunctive relief under 42 U.S.C. § 1983, Americans with Disabilities Act (ADA) (42 U.S.C. § 12101), Section 504 of the Rehabilitation Act (Section 504) (29 U.S.C. § 794), the Religious Land Use and Institutionalized Persons Act (RLUIPA) (42 U.S.C. § 2000-CC), and T.C.A. § 4-1-407.

### Jurisdiction

1. This Court has jurisdiction under 42 U.S.C. §§ 1331 and 1343, and 28 U.S.C. § 1367.

### Parties

2. Plaintiff is a Florida Department of Corrections inmate housed in the Tennessee Department of Corrections (TDOC) at Bledsoe County Correctional Complex (BCCX) Site One under the Interstate Corrections Compact.

3. Defendants Tennessee Department of Corrections (TDOC), Frank Strada, and Brett Cobble are being sued in their official and individual capacities for the purposes of injunctive relief and monetary damages.

### Statement of Facts

1

4. The Tennessee Department of Corrections (TDOC) receives federal financial assistance.

5. **Mobility Impairment:** Plaintiff had severe mobility problems that led to him being referred to a physical therapist while he was housed at Northeast Correctional Complex (NECX) (August 2017-November 2020).

6. On March 5, 2021, Plaintiff received the following Medical-B restrictions: "No heavy lifting 20 lbs. max, able to frequently lift or objects up to 10 lbs., limited strenuous activity for extended periods of time, no continuous standing or walking for extended periods of time, no repetitive stooping or bending, no climbing or balancing (uneven ground), no participation in weight lifting or strenuous athletics or outside work in spring or summer, and must be housed on the on the first floor bottom bunk."

7. In or around September 2023, Plaintiff was diagnosed with lumbar sacral radiculopathy, and thereafter prescribed Nortriptyline for the nerve pain in his right leg and foot.

8. In 2023 or 2024, the Plaintiff was told by a medical provider that he has Neuropathy.

9. **Visual impairment:** The Florida Department of Corrections (FDC) listed the Plaintiff as a visually disabled inmate and allowed him to receive audio book services.

10. On March 17, 2017, the Plaintiff was interstate corrections compacted from the FDC to the TDOC.

11. From March 17 2017 till August 2017, the Plaintiff was housed in TDOC at Bledsoe County Correctional Complex (BCCX) Site One in classification status, from August 2017 till November 2020 at NECX, from November 2020 till September 2022 at BCCX Site Two, and from September 2022 till the present at BCCX Site One in Unit 25B as a classified inmate.

12. BCCX Site One consists of Buildings 21-25. Building 21 houses inmates who are on various segregation statuses, Buildings 22-24 houses inmates who are in classification status and waiting to transfer to their time serving prison, and Building 25 which consists of Units 25A and 25B, houses inmates who are classified to BCCX as their time serving prison.

13. Team Five consists of Buildings 24 and 25, and all of the inmates housed in these units are able to have daily contact with each other.

2

14. Units 25A and 25B each have 64 cells and house a total of 128 inmates per unit. The inmates in these units interact with each other in the core area between these units, the chow hall, library, I- Building, and the ballfield, yard, and gym, when these are offered. Unit 25A inmates also regularly enter Unit 25B to assault, extort, intimidate, rob, and etc. Unit 25B inmates.

**Claim One**

15. All of the housing units in Team Five stay full of K-2 smoke every day and all day long. The smoke in the Team Five housing units is so thick that staff and inmates regularly complain about it[1]. While K-2 has several chemicals in it, BCCX staff who work in Team Five and inmates who are housed in said Team agree that a lot of K-2 that is being consumed in Team Five is sprayed or dipped in Fentanyl.

16. The Center for Forensic Science Research & Education says that the drug commonly referred to as K-2 is known for having drugs in it like Protonitazene[2], Xylazine[3], rat poison, and various other deadly chemicals.

17. On a daily basis a dozen or more inmates in each of the Team Five housing units are noticeably intoxicated from smoking K-2 and / or for consuming alcohol or some type of hard drug.

18. Because there is not enough space in the Segregation Unit (Unit 21) to house all of the inmates that are regularly intoxicated at BCCX Site One, Defendant Brett Cobble has directed that inmates who are noticeably intoxicated be confined in their cells for the remainder of the day that they are seen intoxicated, instead of issuing them disciplinary reports for being intoxicated[4]. He has also directed that if a medical emergency has to be called for an inmate who is intoxicated, that all of the inmates who are housed in the unit where the inmate is housed who had to have the medical emergency called, be confined to their cells for the remainder of the day that the medical emergency was called.

---

[1] **The Plaintiff is not attempting to litigate on behalf of these individuals.** This information is being provided only for the purpose of explaining how thick the K-2 smoke is in all of the Team Five housing units
[2] An opioid three times more powerful than Fentanyl.
[3] An animal sedative known as "tranq," or " zombie drug."
[4] TDOC Policy 502. 05 VI. A  35

3

19. Several of the inmates who smoke K-2 and use other drugs in Team Five have histories of robbing and burglarizing the cells of other inmates, intimidating inmates for commissary to purchase drugs, and some of them even engage in sex acts with other inmates for commissary to purchase drugs. All of these acts regularly happen in Building 25[5] and in Unit 25B.

20. The Plaintiff for more than a year now has suffered from a consistent cough, headaches, and trouble breathing when he remains in Unit 25B for extended hours without getting any fresh air.

21. Plaintiff's medical files show that he started having high blood pressure and elevated heart rate problems since being housed in Unit 25B and that these have got worse as time passed. Additionally, that since the beginning of 2025, he has been to sick-call several times for a thick greenish yellow discharge from his nose. Plaintiff only suffers from the discharge while he is in Unit 25B, and not when he is outside or in any other location.

22. BCCX Site Two has honor units where ninety nine percent if not a hundred percent of the inmates do not do drugs.

23. Over the last several years, the Plaintiff has submitted several requests and grievances requesting to be moved to BCCX Site Two[6].

24. The health issues that the Plaintiff has been suffering from, which are stated in paragraphs 20 and 21 of this Statement of Facts are from the second-hand K-2 smoke that he has unfortunately had to daily consume while he is in Unit 25B.

25. Because of the large quantity of K-2 in Team Five, and a lot of the K-2 having Fentanyl and other deadly drugs in it that can be absorbed via touch, the Plaintiff has lived in a

---

[5] There is also a history in Building 25, of inmate smugglers and dealers paying other inmates' drugs and sometimes money to their CashApps. to physically assault / batter and sometimes stab other inmates.

[6] The Defendants and all of the staff at BCCX consider a move from BCCX Site One to BCCX Site Two, or from BCCX Site Two to BCCX Site One to be a cell change and not a transfer. This is because BCCX classified inmates obtain a move to the opposite Site from the Site they are housed at, the same way that they obtain a cell change to the cell next to them or to another unit, which is by submitting a cell change request to unit management for the Team they are housed in.

4

constant state of mental duress, anxiety, and fear that he will touch something that has Fentanyl or some other deadly drugs or chemical on it and end up in a hospital or dead.

26. Defendants Strada and Cobble are responsible for the K-2 conditions in Team Five and in Building 25. T.C.A. §§ 41-21-104 (a) and (b), and 41-21-201.

**Claim Two**

27. In Unit 25B and possibly in all of the BCCX Site One housing units', inmates loiter on the upper tier and stairs in front of the showers watching inmates while they are showering[7]. While the shower stalking inmates cannot see below the waist of any of the inmates while they are showering, the voyeuristic activities make the Plaintiff[8] and the majority of the inmates[9] in his housing unit so uncomfortable that they keep the lights off in front of the shower stalls and in the shower stalls all day and every day[10].

28. Team Five Unit Manager Paul Oaks issued a Memo directing Team Five unit officers to not allow inmates to loiter on the upper tier and stairs in front of the showers. However, almost all of the inmates in Building 25, and more than likely in all of the Team Five, do not comply with this order or any orders given by staff.

29. Having to daily shower in a dark shower stall to avoid the voyeuristic activity places the mobility and visually disabled Plaintiff at high risk of falling and hurting himself.

30. Non-disabled inmates who are housed in Unit 25B are not at risk of falling and hurting themselves in the showers.

31. The design of the showers at BCCX Site Two makes it impossible for inmates to watch other inmates while they are showering[11].

---

[7] There are dozens of convicted sex offenders in both units in Building 25, and some of the K-2 and other drugs that are consumed by inmates in Building 25 and in Team Five makes inmates overly sexually aroused.

[8] TDOC's Prison Rape Elimination Act (PREA) Screening System Application list the Plaintiff as a " **Sexual Victim."** TDOC Policy 502. 06 VI P states: **"Sexual Victim.** An inmate within TDOC custody who has been identified, utilizing the PREA Screening System Application as **an individual who is at high risk of being sexually victimized."**

[9] **The Plaintiff is not attempting to litigate on behalf of these individuals.** This information is being provided only for the purpose of explaining the level of the uncomfortableness that the voyeurism causes in Unit 25B

[10] The approximately foot and a half of open space between the floor and the bottom of each shower stall doors allows staff to make sure that only one inmate is in each shower stall.

[11] BCCX Site Two houses a large quantity of inmates in general population status who are listed as "**Sexual Victims**" on TDOC's PREA System

5

32. Over the last several years, the Plaintiff has submitted several requests and grievances requesting to be moved to BCCX Site Two[12].

33. Defendant Cobble is responsible for these conditions in Team Five and in Building 25. T.C.A. §§ 41-21-104 (a) and (b), and 41-21-201.

## Claim Three

## Housing Conditions in Team Five and in Building 25 at BCCX Site One.

34. Plaintiff incorporates everything that is stated in Claims One and Two of this Statement of Facts into this Claim and makes them one.

35. Other than a few minimum custody[13] inmates, all of the following types of male inmates who are classified to BCCX, and that cannot be housed at BCCX Site Two or the Annex for any of the following reasons are housed in Units 25A and 25B: (A) medium custody[14] inmates and close custody[15] inmates who have been given custody overrides to medium custody[16]; (B) inmates who have protection problems with other inmates at BCCX Site Two and / or the Annex; (C) inmates who have incompatibles (but not for protection purposes) with inmates at BCCX Site Two and / or the Annex; (D) inmates who are being criminally or administratively investigated and their being housed at BCCX Site Two and / or the Annex would hinder said investigation (s); (E) gang members; (F) drug addicts; (G) dozens of inmates

---

[12] See F.N. 6.

[13] The current 2019 TDOC Classification User Guide (CLASS. User Guide) defines **"Minimum Custody"** as "Based upon criminal history, conduct, and other assessed risk factors, offenders assigned to this custody level appear to pose the least risk to the safety of the facility, staff, community, and other offenders..." PG.33

[14] The TDOC Class. User Guide defines **"Medium Custody"** as, "Offenders in this level are assessed as requiring a moderate level of supervision. Due to the offense history, behavior, detainers, or pending charges, etc. they are not yet appropriate for minimum levels of supervision..." Pg 33

[15] The TDOC Class. User Guide defines **"Close Custody"** as, "Due to their conduct and / or offense history, close custody offenders appear to pose a degree of risk to the safety or security of the institution, community, staff, or other offenders, and therefore , require heightened supervision. Close custody is designed for offenders with recent, frequent, and / or severe histories of assaultive or escape behaviors, which indicate the need for close control This custody level not only provides necessary control and supervision, but also maintains a degree of separation of assaultive, aggressive offenders from their potential victims." Pg. 33

[16] Throughout the time that the Plaintiff has been housed at BCCX Site One, the main reason that close custody inmates have been getting custody overrides is the lack of bed space in Building 21, not because for safety reasons they qualified for such. The custody overrides have allowed said inmates to be moved from Building 21 to Buildings 22-24 if they were / are still waiting to be classified to their time serving prison, and to Building 25 if they were / are classified to BCCX as their time serving prison

6

with extensive histories of violence[17]; (H) convicted sex offenders, and (I) dozens of inmates who have extensive disciplinary histories.

36. The lack of security staff to work in the Team Five housing units and to monitor the mounted security cameras at BCCX Site One has made it where several of the fights and assaults that happen in every Team Five housing unit on a daily basis are not caught by staff. However, security staff know that these fights and assaults are happening based on the number of inmates that regularly walk around with black eyes, busted lips and noses, and other medical problems; inmates reporting the fights and assaults to staff, and the amount of Team Five inmates who regularly try to request protective custody[18].

37. Over the last approximate year there has been hundreds of inmate on inmate fights, dozens of inmate on inmate stabbings, dozens of inmate on staff assaults[19] and several violation of the PREA in Team Five.

38. Other than those acts mentioned in the foregoing paragraph[20]:

A. four of the last five female staff who have been posted to regularly work in Building 25 have been fired for having inappropriate relationships with inmates (Correctional Officers Lisa Eller, Roberts, Vaughn, and another unknown named female officer). Additionally, three of the four female staff who were fired for inappropriate relationships, were also arrested for smuggling drugs and other contraband into the inmates who they were having inappropriate relationships with[21].

---

[17] More than a dozen of these inmates are also severely mentally disabled

[18] There is a common practice at BCCX Site One, of making inmates who request protective custody refuse their cell assignment, which causes said inmates to receive a disciplinary report for Refusal of a Cell Assignment. TDOC Policy 502. 05 56 VI. A. defines the disciplinary infraction of "Refusal of a Cell Assignment" as "Refusal to accept a cell assignment made by a TDOC employee "

[19] Other than in Team Five at BCCX Site One, during the Plaintiff's 27 years of incarceration, he has never been housed in a location where an officer was stabbed in the face with a shank (Building 24), and a sergeant (Williams) had his taser taken from him and was beat with his own taser (Building 25).

[20] **The Plaintiff is not attempting to litigate on behalf of the individuals named in Paragraphs 38 A. – G. of this Statement of Facts**. The information in said Paragraphs is being presented only for the purpose of explaining the conditions in Team Five and in Building 25.

[21] Correctional Officers Lisa Eller, Roberts, and a female officer that the Plaintiff does not know the name of were arrested for smuggling drugs like Suboxone, Cocaine, and Marijuana into the inmates who they were having the inappropriate relationships with.

7

B. Since December 2025, in Building 25, there has been three gang fights involving several inmates and two of the fights also involved shanks, several inmate on staff assaults, and an inmate cut / sliced the face or throat of another inmate.

C. Inmates Seth Tate, Christopher Johnson, and several other inmates have been subjected to PREA violations.

D. SGTs. Billy Lewis, Peters, and Parham were each physically battered / assaulted by inmates.

E. Inmate Maurice Merchant a gang leader who weighs over 300 pounds requested and was approved for placement in protective custody.

F. Inmate Oshea Williams, a high-ranking gang member of a different gang than the gang that Merchant is in, requested and was approved for placement in protective custody.

G. Inmate Roger Carter who has been in prison for more than 20 years, weighed over 230, and is in prison for murder requested and was approved for placement in protective custody after being brutally beat up twice and needed stitches.

39. The lack of security staff to work in Team Five has made it where inmates who are housed in Team Five have been locked down / confined to their cell several dozen of times in the last six months.

40. The lack of security staff to work in Team Five has made it where staff have regularly engaged in ghost rostering[22].

41. The lack of security staff to work in Team Five has caused numerous health and safety issues in the BCCX Site One Chow Hall where only Team Five inmates work[23].

42. The lack of security staff to work in Team Five has made it where inmates commonly pack the property of other inmates who are placed in segregation when staff are supposed to do

---

[22] Ghost rostering is when a staff is assigned to work two different post at the same time. Staff cannot be in two locations at the same time.
[23] Several chow hall staff have been fired for having inappropriate relationships with inmates and several of them have also been arrested for smuggling drugs and other contraband into said inmates, inmates masturbate in a food storage area, inmates urinate in the food and drinks, and items such as blood, staples, paint chips, razors, and K-2 have been found in food trays served to the inmates.

8

such. This practice has caused the theft of some of the property of almost every inmate who has been placed in segregation for the last about year.

43. **The following are the main causes behind the violence that place all of the staff who work in Team Five and all of the inmates who live in said Team at high risk of being physically and / or sexually harmed:**

A. Housing inmates who have extensive histories of violence, medium custody inmates and close custody inmates who have been given custody overrides to medium custody, and inmates with extensive disciplinary histories in the same housing units with inmates who are minimum custody, non-violent, and inmates who have no disciplinary histories and/or histories of violence[24];

B. Staff shortages at BCCX Site One; and

C. All of the unlawful drugs in Team Five. See Claims One and Two, and Paragraphs 36 - 42 of this Statement of Facts.

44. **The following facts show that the Defendants have known that a substantial risk of inmate attacks in Team Five has been longstanding, pervasive, well documented and expressly noted by prison officials since the beginning or middle of 2025:**

A. Defendant Cobble who is statutorily charged with examining into the affairs of BCCX daily, has been aware of the conditions in Team Five and Building 25 as a result of his daily examination into the conditions at BCCX Site One. T.C.A. § 41-1-104 (b).

B. BCCX paperwork shows that the worse population inmates at BCCX are housed in Building 25.

C. All of the incidents explained in Claim One and Two 36 - 42 and Paragraphs of this Statement of Facts.

D. The amount of incident reports, disciplinary reports, and criminal and administrative investigations into acts that have been committed in Team Five.

---

[24] TDOC Policy 506. 14 .C. 2. prohibits inmates of different custody levels from being housed in the same housing units.

E. TDOC's 2025 annual fiscal report. It explains that the staff shortages at all of the State and private prisons in TDOC is the cause of the violence at all of the prisons, including BCCX Site One.

F. Tennessee Senate State and Local Government Corrections subcommittee findings that staff shortages at BCCX and across TDOC are contributing to the violence throughout TDOC.

G. News reports like the following one that aired on October 2, 2025 on a local news station in the BCCX area: Safety Concerns Behind Bars: Correctional Staffing Shortages Remain High in Tennessee.

H. Every staff who the Plaintiff has spoken with said that while TDOC's 2025 annual fiscal report showed that there were 43 correctional officer vacancies at BCCX, that on a daily basis there are more than 43 additional BCCX correctional officers that do not daily report to work and / or that are out from work on the Family Medical Leave Act[25].

I. BCCX staff commonly referring to Team Five and primarily Building 25 as the "junkyard" of BCCX.

J. The Plaintiff has submitted several grievances on the extremely violent conditions in Team Five and in Building 25.

45. **The Defendants have known for several years that the Plaintiff is a member of an identifiable group who is at Substantial risk of being harmed.**

46. According to paperwork that FDC provided to TDOC, the Plaintiff was interstate compacted to TDOC, because of the amount of news articles and broadcasts that identified him as regularly communicating with federal law enforcement officials about FDC staff being cause of the brutal death of Inmate Darren Rainey and the unconstitutional conditions in FDC which made it where the Plaintiff could not be safely housed at any FDC prison[26]. One such news article published by the Miami Herald newspaper in 2015 titled "Inmate who Exposed Florida Prisons Culture of Cruelty," stated: "Hempstead's steadfast determination to expose the

---

[25] BCCX also has staff who regularly do not report to work, because they volunteer to work at other prisons in TDOC for higher pay.

[26] While the Plaintiff agrees that this has caused him substantial protection issues and that he does have substantial protection issues in FDC, he does not think that this was FDC's real motivation for interstate compacting him.

monstrous acts he says he witnessed ultimately brought about an overhaul of the prison system, the firing of top correction officials and officers, federal arrests, and an ongoing investigation by the U.S. Department of Justice."

47. In addition to FDC's PREA system[27], while the Plaintiff was housed in FDC, the prison system had a general population housing system called the "Inmate Risk Management System" (IRMS) that was used to identity if inmates were or were not a physical threat to others, or if they were at risk of being physically harmed by other inmates. The Plaintiff was listed as "Identified Prey" on IRMS prior to him being transferred to TDOC. Identified Prey was a designation that FDC gave to inmates who were at high risk of being harmed by other inmates.

48. As part of the interstate compact agreement between FDC and TDOC, FDC provided TDOC with documentation showing the information in the foregoing two paragraphs, and that the Plaintiff had a lengthy history of protection problems relating to the information in Paragraph 46 of this Statement of Facts and other matters similar to what is stated in said paragraph.

49. The Defendants have known by the documentation TDOC received from FDC prior to or shortly after the Plaintiff was transferred to TDOC, that the Plaintiff would be at a substantial risk of being physically harmed if he was housed in a violent environment in TDOC like Team Five at BCCX Site One, where inmate attacks have been longstanding, pervasive, well documented, and expressly noted by prison officials.

50. The Defendants have also known that since the Plaintiff has been housed in TDOC, he has been listed as a "Victim" on TDOC's PREA System.

51. While TDOC does house inmates who are members of identifiable groups who are at substantial risk of being physically or sexually harmed at BCCX Site Two, **currently there are at least two inmates who are members of identifiable groups, other than the Plaintiff, who are currently housed in Team Five at BCCX Site One.** Inmate Roland Dial (659277) is a former TDOC Correctional Officer and Inmate Christopher Dotson (439254) is a petite transgender. Dial is minimum custody, he does not do drugs, and he continues to be housed with violent inmates, drug addicts, gang members, and at least one inmate who manufactures

---

[27] Sexual Risk Indicator.

shanks[28]. Dotson[29] is constantly sexually harassed and was previously extorted by one of the gangs in Building 25 into trying to introduce drugs into the BCCX Site One Visitation Gallery. Dotson explained in an appeal grievance that he filed with the Inmate Disciplinary Oversight Board that the gang intimidated him into trying to introduce the drugs and that he was in fear of his life to report it to BCCX staff, because of their history in failing to protect inmates in Team Five[30].

52. The Plaintiff has filed grievances on how the inmates who are members of identifiable groups who are housed in Team Five are at substantial risk of being harmed, and that they should be moved to BCCX Site Two. TDOC Policy 404. 09 VI. A. 2. B.

53. To ensure that the Plaintiff was safe, TDOC housed him in general population in the safest honor unit at NECX from August 2017 till November 2020[31], and in general population in what was unofficially considered the safest honor unit in Team Two at BCCX Site Two from November 2020 till September 2022.

54. In September 2022 a pretext that the Plaintiff needed to be housed in a handicap cell was used to move the Plaintiff from BCCX Site Two to BCCX Site One. This was done as punishment because he filed a grievance explaining that TDOC's failure to comply with 28 C.F.R. § 35. 106 caused him to not know how to apply for an accommodation, and if TDOC would advise him how to do such, he would ask for TDOC to comply with 28 C.F.R. § 35.152 and extend the bottom bunk in his BCCX Site Two cell four inches and raise the top bunk in his cell three inches. Grievance # 355689.

55. While the conditions in Team Five at BCCX Site One were worse than those at BCCX Site Two prior to the end of 2024, and the conditions in Team Five started deteriorating

---

[28] He is having these problems primarily because ninety -nine percent of the inmates in Building 25 are violent, drug addicts, gang members, and have histories of violence.

[29] Dotson is supposed to have minimum custody status, but a piolet program that is currently being ran at BCCX is preventing him from being reclassed

[30] **The Plaintiff is not attempting to litigate on behalf of these inmate**. This information is being provided only for the purpose of explaining that his current housing in Building 25, is an unconstitutional practice of housing inmates who are members of identifiable groups in locations like Team Five where inmate attacks have been longstanding, pervasive, well documented, and expressly noted by prison officials

[31] NECX conditions have got much worse since the Plaintiff's November 2020 transfer from there.

in the end of 2024, the conditions in Team Five did not reach unconstitutional dimensions until the beginning or middle of 2025.

56. BCCX Site Two has 16 housing units identified as 1-16. Unit 1 is the Segregation Unit, Unit 2 is the Protective Custody unit for inmates participating in the T-Com Program (Therapeutic Community), Unit 3 is the Veterans Unit, Units 15 and 16 are T-Com units for general population inmates, and the remaining units house only minimum custody general population inmates.

57. Since BCCX Site Two is primarily a facility for minimum custody general population inmates participating in vocational and academic programs to better their chances of obtaining parole and not returning to prison after their release, it is considered to be the safest prison in TDOC that houses only minimum custody inmates[32].

58. For the reasons explained in the foregoing paragraph, TDOC also houses inmates in general population at BCCX Site Two who have protection problems or that could have protection problems because of something in their past if they were housed at other prisons in TDOC[33].

59. It is the common practice of Defendant Cobble and BCCX staff to move all minimum custody inmates who are from Tennessee and who are housed in Building 25 at BCCX Site One to BCCX Site Two unless they have some type of restriction or job prohibiting them from being housed at BCCX Site Two.

60. The Defendants and all of the staff at BCCX consider a move from BCCX Site One to BCCX Site Two, or from BCCX Site Two to BCCX Site One to be a cell change and not a transfer. This is because BCCX classified inmates obtain a move to the opposite Site from the Site they are housed at, the same way that they obtain a cell change to the cell next to them or to another unit, which is by submitting a cell change request to unit management for the Team they are housed in[34].

---

[32] Inmates at BCCX Site Two who receive a disciplinary report that causes their custody to be enhanced to medium or close custody are transferred from said prison

[33] At least one former correctional officer and two or more transgenders were housed at BCCX Site Two when the Plaintiff was previously housed there from November 2020 till September 2022.

[34] The final decision is made by the Warden, who sub judice is Defendant Cobble.

61. Plaintiff is a minimum custody, non-violent offender, who is listed as a "Victim" on TDOC's PREA System, he has no incompatibles, and his medical files show that he does not have any Medical – B restrictions or ADA accommodations requiring him to be housed in a handicap cell or at BCCX Site One. In other words, he does not have any restrictions prohibiting him from being moved or housed at BCCX Site Two.

62. Over the last several years, the Plaintiff has submitted several cell change requests and grievances requesting to be moved to BCCX Site Two[35].

63. **The Defendants current practice in Team Five is to not move any inmate who could be at risk of being physically harmed from BCCX Site One to BCCX Site Two unless they are physically or sexually assaulted / battered.**

64. The Plaintiff has suffered from constant anxiety, tension, worry, and lack of sleep every night from uncertainty not concerning if he is possibly going to be physical harmed, but when he is going to be harmed and to what degree, because of the conditions in Team Five and in Building 25.

59. The Plaintiff has had to alter his behavior by spending a substantial amount of time even when he is not at work assisting inmates with their legal matters[36] and other issues that inmates regularly have in Team Five, when he is supposed to be and wants to spend his time being obedient to the commands in Scripture to keep his mind focused on God and the things of God if he wants the peace of God (Isa. 26: 3; Phi. 4: 8, 9; Jn. 16: 33), to draw near to God if he wants God to draw near to Him (Jam. 4: 8; Heb. 10: 22; Ps. 73: 28), to study Scripture to show himself approved unto God ( Ac. 17: 11; 1 Tim. 4: 6, 13; 2 Tim. 2: 15; 3: 10, 16, 17; 4: 2; Tit. 2: 6 ,7 ,10; Deut. 6: 5-9), pray without ceasing ( I Thess. 5: 17 ), to preach the gospel and teach Scripture (Mt. 28: 19, 20; Mk. 16: 15; Rom. 10: 14-17; 2 Tim. 4: 2), and to worship God. Ex. 20: 4, 5; Mt. 4: 10, 24; Rev. 19: 10; 22: 9.

---

[35] The Plaintiff has never requested protective custody status for the following reasons: (1) TDOC Policy 404. 09 explains that he does not qualify for such and that he only qualifies for a unit and cell change to BCCX Site Two. TDOC Policy 404. 09 VI. A. 2. B. ; (2) Plaintiff would be subjected to several violations of his constitutional and federal rights in protective custody status; (3) Plaintiff would not be able to practice his faith as Protestant Reformed Christian in protective custody status, (4) Plaintiff would have threats to his safety in protective custody status that he does not have in general population status; and (5) having it on his TDOC record that he has been in protective custody status places him at risk of being harmed the rest of the time he is incarcerated in TDOC.
[36] Inmates who can be of a benefit other inmates enhance their ability to survive in violent prison environments

14

60. Defendants Strada and Cobble are responsible for these conditions in Team Five and in Building 25. T.C.A. §§ 41-21-104 (a) and (b), and 41-21-201.

## Claim Four

61. Plaintiff incorporates everything that is stated in Claim Three of this Statement of Facts into this Claim and makes them one.

62. TDOC has a statewide pattern and practice of not taking any steps to prevent inmates who are members of identified groups[37] who are at substantial risk of being physically or sexually harmed from being housed in extremely violent locations like Team Five at BCCX Site One, where inmate attacks have been longstanding, pervasive, well documented, and expressly noted by prison officials.

63. TDOC does not have a policy that explains / gives guidance on what general population prisons inmates who are members of identifiable groups who are at a substantial risk of being physically harmed should be housed in general population in TDOC[38].

64. While TDOC does house inmates who are members of identifiable groups who are at substantial risk of being physically or sexually harmed at BCCX Site Two, **currently there are at least two inmates who are members of identifiable groups, other than the Plaintiff, who are currently housed in Team Five at BCCX Site One.** Inmate Roland Dial (659277) is a former TDOC Correctional Officer and Inmate Christopher Dotson (439254) is a petite transgender. Dial is minimum custody, he does not do drugs, and he continues to be housed with violent inmates, drug addicts, gang members, and at least one inmate who manufactures shanks[39]. Dotson is constantly sexually harassed and was previously extorted by one of the gangs in Building 25 into trying to introduce drugs into the BCCX Site One Visitation Gallery. Dotson explained in an appeal grievance that he filed with the Inmate Disciplinary Oversight Board that

---

[37] Former law enforcement officials, former informants, transgenders, young petite inmates, and high-profile inmates like the Plaintiff who have received substantial media attention referencing their cooperation with federal law enforcement officials.

[38] While BCCX Site Two is considered the safest prison in TDOC, Turney Center, Lois M. DeBerry Special Needs Facility and, Riverbend are also considered to be the next three safest TDOC prisons.

[39] He is having these problems primarily because ninety -nine percent of the inmates in Building 25 are violent, drug addicts, gang members, and have histories of violence.

15

the gang intimidated him into trying to introduce the drugs and that he was in fear of his life to report it to BCCX staff, because of their history in failing to protect inmates in Team Five[40].

65. The Defendants and all of the staff at BCCX consider a move from BCCX Site One to BCCX Site Two, or from BCCX Site Two to BCCX Site One to be a cell change and not a transfer. This is because BCCX classified inmates obtain a move to the opposite Site from the Site they are housed at, the same way that they obtain a cell change to the cell next to them or to another unit, which is by submitting a cell change request to unit management for the Team they are housed in[41].

66. Plaintiff is a minimum custody, non-violent offender, who is listed as a "Victim" on TDOC's PREA System, he has no incompatibles, and his medical files show that he does not have any Medical – B restrictions or ADA accommodations requiring him to be housed in a handicap cell or at BCCX Site One. In other words he does not have any restrictions prohibiting him from being moved or housed at BCCX Site Two.

67. **The Defendants current practice in Team Five is to not move any inmate who could be at risk of being physically or sexually harmed from BCCX Site One to BCCX Site Two unless they are physically and / or sexually assaulted / battered.**

68. Over the last several years, the Plaintiff has submitted several cell change requests and grievances requesting to be moved to BCCX Site Two.

69. Defendant Strada, as Commissioner of TDOC, is responsible for this TDOC statewide pattern and practice.

70. Defendant Strada has the power and authority to stop this pattern and practice and to enact a policy that explains / gives guidance on what general population prisons inmates who are

---

[40] **The Plaintiff is not attempting to litigate on behalf of these inmate.** This information is being provided for the sole purpose of explaining that (not the Plaintiff's move from BCCX Site Two to BCCX Site One), but his current housing in Building 25 since it has reached unconstitutional conditions is the result of an unconstitutional practice of housing inmates who are members of identifiable groups in locations like Team Five where inmate attacks have been longstanding, pervasive, well documented, and expressly noted by prison officials.
[41] The final decision is made by the Warden, who sub judice is Defendant Cobble.

members of identifiable groups who are at a substantial risk of being physically harmed should be housed in general population in TDOC[42].

71. Defendants Strada and Cobble are responsible for the conditions in Team Five and in Building 25. T.C.A. §§ 41-21-104 (a) and (b), and 41-21-201.

**Claim Five**

72. Plaintiff incorporates everything that is stated in Claim Three of this Statement of Facts into this Claim and makes them one.

73. The Plaintiff, who has a Doctor of Biblical Studies Degree and is a licensed preacher, is a member of the Presbyterian Church in America (PCA), which is a Protestant Reformed Christian Church. He is also the author of the book, "Protestant Christianity: A Prisoner's Perspective and Defense."

74. Plaintiff believes what the Bible and the Westminster Confession of Faith teach as it concerns that he is to show his love to God by keeping His commandments. Jn. 14: 15, 23; 15: 10; 1 Jn. 2: 3-5; 3: 24.

75. The Plaintiff has had to alter his behavior by spending a substantial amount of time even when he is not at work assisting inmates with their legal matters,[43] and other issues that inmates regularly have in Team Five, when he is supposed to be and wants to spend his time being obedient to the commands in Scripture to keep his mind focused on God and the things of God if he wants the peace of God (Isa. 26: 3; Phi. 4: 8, 9; Jn. 16: 33), to draw near to God if he wants God to draw near to Him (Jam. 4: 8; Heb. 10: 22; Ps. 73: 28), to  study Scripture to show himself approved unto God ( Ac. 17: 11; 1 Tim. 4: 6, 13; 2 Tim. 2: 15; 3: 10, 16, 17; 4: 2; Tit.2: 6 ,7 ,10; Deut. 6: 5-9),  pray without ceasing ( I Thess. 5: 17 ), to preach the gospel and teach Scripture (Mt. 28: 19, 20; Mk. 16: 15; Rom. 10:14-17; 2 Tim. 4:2), and to worship God. Ex. 20: 4, 5; Mt. 4: 10, 24; Rev. 19: 10; 22: 9.

---

[42] While BCCX Site Two is considered the safest prison in TDOC, Turney Center, Lois M. DeBerry Special Needs Facility and, Riverbend are also considered to be the next three safest TDOC prisons

[43] Inmates who can benefit other inmates enhance their ability to survive in violent prison environments.

76. Defendants Strada and Cobble are responsible for these conditions in Team Five and in Building 25 that have caused the Plaintiff to be denied his right to practice his faith as a Protestant Reformed Christian. T.C.A. §§ 41-21-104 (a) and (b), and 41-21-201.

## Claim Six[44]

77. **Section One:** On March 11, 2025, the Plaintiff, who is the BCCX Site One Legal Aide witnessed Correctional Officer Kermnitzer tell Inmate Alexander Friedmann that he had persistently told him to stop preparing and typing other inmates legal work and that if Kermnitzer again caught Friedmann preparing and typing other inmates legal work, he would issue Friedmann a disciplinary report[45].

78. On March 12, 2025, Friedmann returned to the library, got on the typing computer, and continued typing the same inmate's legal work that Kermnitzer caught him typing on March 11, 2025. When Kermnitzer told Friedmann that he was going to issue him a disciplinary report, Friedmann responded "that's fine and I'll sue you."

79. On March 13, 2025, Friedmann entered the library, approached the Plaintiff's desk and asked him if he would sign an affidavit stating the following lies: (1) that Kermnitzer told the Plaintiff that he could not "assist" inmates in preparing legal documents or help them research their case; (2) that the Plaintiff was from Florida and that he did not know Tennessee law; and (3) that the Plaintiff did not understand Tennessee Rule of Appellate Procedure 11.

80. Plaintiff told Friedmann that he would not give him an affidavit stating anything, that everything that he wanted the Plaintiff to say was a lie, that the Plaintiff was far more educated in law than Friedmann was, and that Friedmann would have to be a fool to think that the Plaintiff would give him an affidavit attacking and lying on himself and lying on Kermnitzer.

---

[44] On March 6, 2026, Inmate Alexander Friedmann filed a Civil Rights Complaint in this Court raising several frivolous claims. (Case No.: 3: 26-258). The Plaintiff in this case is mentioned in Friedmann's Complaint. All of the facts in this Claim are relevant for showing that the Claims in Friedmann's Complaint are false and that the Defendants sub judice have failed to protect the Plaintiff from Friedmann.
[45] See TDOC Policies 502. 05 VI A 57 and 70, 501. 04, and 509 02-1 VI. C.

18

81. Following this discussion with Friedmann, the Plaintiff drafted and signed an affidavit to give to Defendant Cobble explaining in detail Friedmann's attempt to get the Plaintiff to give him an affidavit lying on Kermnitzer[46].

82. **Section Two:** Shortly after the Plaintiff's March 5, 2025 appointment as the BCCX Site One Legal Aide, Friedmann told the Plaintiff that since he / Friedmann could not draft and type other inmates legal work[47], he was going to start sending all of the inmates who go to him for help with their law work to the Plaintiff. Friedmann also said that if for some reason the Plaintiff did not assist said inmates with their law work, he was going to get an affidavit from them and use said affidavits to try to sue Defendant Cobble for not approving him / Friedmann to become an Inmate Legal Helper[48]. TDOC 501. 04.

83. In March, 2025, Inmate Shane Parks told the Plaintiff in the BCCX Site One Library that he had till sometime in October or November 2025 to file a Petition for Post-Conviction (Petition), that he did not have any of his legal papers, and that he wanted to know if the Plaintiff could assist him with filing the foregoing Petition. Friedmann previously told the Plaintiff that he was going to be sending Parks to talk with the Plaintiff and that Parks spent the majority of his time using drugs and not focusing on his case. For this reason, the Plaintiff told Parks when he / Plaintiff spoke with Parks in the Library that he would assist Parks as much as possible, that Friedmann told the Plaintiff that he / Parks spent more time worried about getting high than focusing on his legal work, and that if he / Parks really wanted to get his Petition completed, he would need to focus more on his legal work than on using drugs. Parks said he agreed and that when he received his legal papers in the mail, he would bring them to the Plaintiff[49].

---

[46] The Plaintiff did this because he knew that Friedmann was very manipulative and that he / Friedmann might produce a false affidavit in the Plaintiff's name saying the lies that Friedmann wanted the Plaintiff to give an affidavit stating

[47] While Friedmann told the Plaintiff this, he has continued to assist inmates with their legal work since he has been housed at BCCX Site One.

[48] The Plaintiff advised Kermnitzer and Correctional Officer Donnan of these matters as soon as Friedmann said them to the Plaintiff The Plaintiff also documented this conversation with Friedmann in the Legal Aid Request Log Book that was eventually obtained by TDOC Internal Affairs (IA) Officer Jason Dykes.

[49] The Library Pass Log book will show that this was the only visit that Parks made to the Library prior to the Plaintiff giving IA Officer Dykes an affidavit in the end of 2025 concerning how Friedmann and Parks were trying to set Defendant Cobble and the Plaintiff up with a false legal claim that Friedmann wanted to bring in a federal lawsuit.

19

84. In or around the middle or end of September 2025 Parks told the Plaintiff that he should be receiving his legal papers soon, and he again asked if he could bring said papers to the Plaintiff when he received them. The Plaintiff told Parks that he could and for him to please give his legal papers to him / the Plaintiff as soon as Parks received them.

85. In or around the middle of October 2025, Parks told the Plaintiff that he received his legal papers, but that he gave them to Friedmann to read first. Parks asked again if he could bring his paperwork to the Plaintiff and again stated that his deadline was in the end of October 2025 or sometime in November 2025. The Plaintiff told Parks that he should have brought his legal papers to the Plaintiff to read first since he was asking the Plaintiff for help. Also, that if Parks really wanted the Plaintiff's assistance with his law work, he would bring the Plaintiff his law work that night. Parks did not bring the Plaintiff his law work that night.

86. Around the end of October or the beginning of November 2025, Parks finally brought the Plaintiff his law work and told him / the Plaintiff that his legal deadline was two days away from the date that he gave the Plaintiff said law work. The Plaintiff told Parks that he would do what he could to read the 100 to 150 pages of law work that Parks gave him, and that he would do the best he could to draft a Petition for Parks.

87. The next day Parks approached the Plaintiff and said that he should have put his legal matters first before getting high and that he wanted the Plaintiff to give his law work back to him / Parks, because he changed his mind about filing a Petition for Post-Conviction Relief. The Plaintiff returned his law work to Parks as he requested[50].

88. After the Petitioner learned that Friedmann was behind Parks constantly withholding giving his legal papers to the Plaintiff, and that Friedmann was trying to bring these matters with Parks into a lawsuit, that he / Friedmann hoped would be successful with getting him approved to help other inmates with their law work, the Plaintiff provided a Sworn Affidavit to I.A. Officer Dykes explaining that he knew Friedmann was filing paperwork with Defendant Cobble on the Parks matters, but that he / Friedmann was not telling Defendant Cobble any of the foregoing facts. Additionally, that Friedmann thought that by having Parks play games with

---

[50] C.C.O. Donnan heard Parks admit to the Plaintiff that he only allowed the Plaintiff to hold his law work overnight / for one day.

giving the Plaintiff his legal papers so close to his legal deadline date, and then having Parks take them back from the Plaintiff, he could create a narrative that Parks could not get his Petition completed for some reason that the Plaintiff was to blame for, and that if he / Friedmann was able to help inmates with their law work, every inmate at BCCX Site One would be able to get their law work completed. The Plaintiff also explained in the Affidavit that he learned that Friedmann had told Parks that if he / Parks agreed to let him use his name for the reasons that have been explained, Friedmann would try to convince the court to give Parks permission to file a belated Petition for Post- Conviction Relief, wherein he would explain among other things that Park was not able to get his Petition timely filed because he / Parks was not provided with sufficient access to the BCCX Site One Legal Library.

89. Finally, The Plaintiff explained in the Affidavit that he believed that Parks did not receive his legal papers until in or around the middle of October 2025. Also, that the Plaintiff believed that Friedmann directed Parks to play the games that he played with giving the Plaintiff access to his legal papers, because all of the inmates that he sent to the Plaintiff with very close deadlines, he / the Plaintiff was able to timely complete.

90. **Section Three:** Initially, when Friedmann received a disciplinary report from Sgt. Mace for writing a grievance and signing Inmate Phillip Young's (#473028) signature to it, he told the Plaintiff that he was allowed to write grievances for other inmates and that Mace did not have any proof that he signed it. Additionally, that it was the Young's word against Friedmann's that Friedmann signed it and not Young. The Plaintiff told Friedmann that TDOC Policy did not permit him to write grievances for other inmates, and that he was crazy if he signed another inmate's name to a grievance.

91. Around the time that Friedmann received the disciplinary report from Mace, he started telling other inmates that Phillips was a "snitch," and that the inmates he told the foregoing to should tell other inmates that Phillips was a snitch. Friedmann did this because he did not like that Phillips told the truth, which was that he did not write or sign the grievance that Friedmann submitted in his / Phillips name. Friedmann knew that telling other inmates that Phillips was a snitch, placed Phillips at a substantial risk of being physically harmed. However, he did not care. His goal was to try and manipulate other inmates to hurt Phillips because Philips

defended himself against Friedmann's writing, signing and submitting a grievance in his / Phillips name.

92. Friedmann was found guilty of the foregoing disciplinary report and he eventually filed a petition in a Chancery Court challenging the disciplinary report on procedural errors.

93. In 2025, the Chancery Court ordered that Friedmann receive another hearing on the disciplinary report that Mace issued him. To try and enhance his chance of winning the second disciplinary hearing, Friedmann created a false affidavit in the Plaintiff's name, and introduced it at the second hearing. The BCCX Site One Disciplinary Board Sergeant knew that there was a high likelihood that the affidavit in the Plaintiff's name was false.

94. Friedmann was again found guilty at the second disciplinary hearing and he lost his disciplinary appeal grievance at all levels of the appeal process. However, the Plaintiff believes that sometime after losing the appeal process, TDOC expunged the disciplinary report from Friedmann's TDOC record.

95. The Plaintiff advised I.A. Officer Dykes that the affidavit in the Plaintiff's name that Friedmann introduced at the second hearing on the disciplinary report that Mace issued him was false and not signed by him / the Plaintiff.

96. Friedmann and the Plaintiff both have histories of receiving extensive media attention[51]. The Plaintiff believes that Friedmann created the false affidavit in the Plaintiff's name to manipulate TDOC into believing that if the disciplinary report that Mace issued Friedmann was not expunged from his file, TDOC would receive negative media attention via Friedmann's or the Plaintiff's media contacts.

97. **Final Facts:** Throughout the years that Friedmann has been housed at BCCX Site One, he has ordered the emails and other records of any and all BCCX staff that have got him upset and he has had his wife and attorney assist him with obtaining said records[52]; threatened

---

[51] The Plaintiff's media attention pertained to matters concerning the FDC.

[52] Friedmann has shown these staff emails and records to inmates to manipulate them into believe that he is the type of inmate that they want to have on their side to get staff to leave them alone He has done the foregoing to gain rank in the inmate community by convincing inmates that staff fear him It should further be noted that the Plaintiff is aware of Friedmann previously ordering the emails of Defendant Cobble, Unit Manager Paul Oaks, former Education Principle Larry DeWeese, Counselor Eric Paulk, Sgts. Ariel Mace and Jerry Johnson, C C.O. Donnan, former C.C.O Brent Kermnitzer, possibly Associate Wardens Johnathan Higdon and Shannon Green, and

every staff that has done anything to anger him with grievances and lawsuits; written articles under the alias Ivan D. for the Yardbird Magazine that have falsely accused BCCX staff of doing all types of things that they have not done[53]; produced false affidavits on staff and in other inmates' names[54]; written grievances and complained constantly to staff about such things as a clock in the chow hall needing a battery, breakfasts trays missing butter and on other occasions sugar; and he has accused every staff who has not submitted to his will of retaliation, harassment, and other forms of bias[55].

98. No TDOC staff has taken any action to discipline or stop Friedmann's foregoing actions[56]. Also, staff have not taken any action to stop Friedmann from trying to make the Plaintiff get involved with his lies against numerous TDOC staff even though they have known for approximately a year that has been actively trying to get the Plaintiff involved with his frivolous lawsuit that is based on lies that he had been pursuing against TDOC Commissioner Strada and several BCCX staff.

99. The failure of TDOC staff to take any action against Friedmann for any of these things has led to him on March 6, 2026 filing a 42 U.S.C. § 1983 Civil Rights Complaint in the United States District Court in Nashville, Tennessee against TDOC Commissioner Strada, and BCCX Warden Cobble, Mace, and former C.C.O. Kermnitzer raising several false claims. Case No.: 3:26 – 258.

---

the Plaintiff believes there are several other staff that he has obtained emails and / or records from as part of his paper terrorism intimidation and harassment tactics against TDOC staff.

[53] He has also written articles for the Yardbird that have presented false facts about inmates, so he could receive payment and favors from said inmates.

[54] Other than the false affidavit that Friedmann produced on the Plaintiff, the Plaintiff knows that Friedmann has also produced a false affidavit accusing C.C.O. Donnan of witnessing something that she said she did not witness, and he produced a false affidavit in Inmate Michael May's (639276) name May has also given TDOC officials a document refuting the affidavit that Friedmann produced in May's name.

[55] These paper terrorism and harassment tactics that Friedmann has employed against BCCX staff have made it where several staff are intimidated into not doing their jobs when it involves Friedmann. For instance, staff believe they cannot thoroughly search Friedmann's legal boxes that he is only supposed to store his legal papers in, even though staff know there has been allegations that he / Friedmann smokes K-2, and that for payment he stashes / stores legal documents and other papers that have K-2 on them, and that he could be storing said papers and drugs in his legal boxes

[56] TDOC staff could have issued Friedmann a disciplinary report for producing the false affidavit in the Plaintiff's name See TDOC Policy 502. 05 VI A 26 (Falsifying, Altering, or Forging an Official Document) which states "Changing, modifying, or altering the writing of others, or the fraudulent making of any writing. This includes falsifying documents such as passes, ID cards, letters, etc."

23

100. Friedmann alleges in his Complaint: (A) that Inmate Phillip Young signed the grievance that Friedmann wrote for him and that Young later told TDOC that he did not sign the grievance so he could obtain a benefit from TDOC; (B) that Kermnitzer issued him a disciplinary report for preparing and typing another inmate's legal document, when the inmate allegedly did not have anybody else to assist him with said legal document; (C) that the Plaintiff gave him an affidavit favoring his / Friedmann allegations that Mace set him up with a retaliatory disciplinary report; and (D) that the Plaintiff, who has been the BCCX Site One Legal Aide since March 5, 2025, did not assist two other inmates with their legal work.

101. In February 2026, after Friedmann found out that there was a high likelihood that the Plaintiff had been taken steps to oppose the false narratives that now appear in Friedmann's Complaint, he told several inmates that there were two cases on Westlaw, that shows that the Plaintiff is a former confidential informant and that he put several people in Florida prison (FDC)[57]. Hempstead v. McAlpin, 2008 WL 5101770 (N. F. FL. 2008); Hempstead v. Halley, 2011 WL 4374958 (N. D. Fl. 2011).

102. When the Plaintiff was questioned by other inmates about the foregoing, he told them that the Westlaw cases do not say that he was a former confidential informant that put people in the FDC for drugs, violent acts, thefts, etc., and that he / Friedmann knew that the Plaintiff had previously cooperated with federal authorities concerning FDC staff being the cause of the brutal death of Inmate Darren Rainey, the unconstitutional conditions in FDC, and government officials committing other acts of misconduct.

103. Just like Friedmann unsuccessfully tried to manipulate other inmates into physically hurting Young by falsely accusing him with several other inmates of being a "snitch" when he was not, Friedmann tried to manipulate other inmates into physically hurting the Plaintiff by accusing him of being a "snitch" that put several people in prison for things like drugs, violent acts, thefts, etc.

104. Since February 2026, Friedmann has been submitting public records requests to TDOC and the Tennessee Attorney General's Office trying to obtain any information that he can

---

[57] The Plaintiff advised Unit Manager Paul Oaks and other staff of these actions by Friedmann

24

to try and get other inmates to harm the Plaintiff. Friedmann has also been asking his wife and attorney to assist him with obtaining this information.

105. Friedmann himself is not a physical threat to the Plaintiff, so the only thing he can do is try to manipulate other inmates to harm the Plaintiff.

106. Friedmann has a TDOC "Commissioner's Alert" designation on him[58].

Plaintiff has been told that Friedmann's "Commissioner's Alert" designation prohibits him from being able to be transferred from BCCX Site One without the Commissioner's approval.

107. Defendant Strada requiring Friedmann to remain at BCCX Site One and Defendant Cobble's refusal to move the Plaintiff to BCCX Site Two, makes it where Defendant Cobble is continuing to subject the Plaintiff to Friedmann's attempts to try and get his hands on some information that can get the Plaintiff harmed.

108. Defendant Cobble is responsible for failing to protect the Plaintiff from Friedmann. T.C.A. §§ 41-1-104 (a) and (b), and 41-21-201.

109. Defendants Strada and Cobble have the power and authority to grant the injunctive relief sought in this Complaint. T.C.A. §§ 41-1-104 (a) and 41-21-201.

## Exhaustion of Administrative Remedies

Plaintiff has exhausted all available administrative remedies. Ross v. Blake, 578 U.S. 632 (2016).

## Statement of Claims

**Claim One:** The Defendants have subjected the Plaintiff to unconstitutional housing conditions by not taking any steps to stop the large amount of K-2 consumption by inmates in Team Five and in Building 25, and as a result of such, the Plaintiff is forced to inhale second hand K-2 smoke all the time that he is in Unit 25B.

---

[58] Friedmann has alleged that this designation pertains to details associated with the criminal case that he is incarcerated on.

The Plaintiff's unwilling inhaling of the second-hand K-2 smoke has caused him several medical / health problems and to live in a constant state of mental duress, anxiety, and fear that he is going to touch something that has Fentanyl or some other deadly drug or chemical on it and end up in a hospital or dead.

Defendants TDOC, Strada, and Cobble are being sued in their official capacities for injunctive relief, and Defendants Cobble and Strada are being sued in their individual capacities for monetary damages[59]. U.S. Const., 8th Amend.; Zakora v. Chrisman, 44 F. 4th 452 (6th Cir. 2022); Farmer v. Brennan, 114 S. Ct. 1070 (1994); Helling v. McKinney, 113 S. Ct 2475 (1993).

**Claim Two:** The Defendants have subjected the mobility and visually disabled Plaintiff, who is listed as a "victim" as TDOC's PREA System, to violations of his rights under the Americans with Disabilities Act (ADA) ( 42 U.S.C. § 12101); Section 504 of the Rehabilitation Act (Section 504) (29 U.S.C. § 794), and the PREA (34 U.S.C. § 30301) by placing him in an environment where if he showers with the lights on in the area in front of the showers and in the shower stalls, the inmates who loiter on the upper tier and stairs in front of the showers, will watch him, which makes him feel very uncomfortable and places him at risk of victimization, and if he showered with the lights off in the foregoing areas, he will be at high risk of falling and hurting himself. Non-disabled inmates who are housed in the same unit with the Plaintiff and in all of the BCCX Site One housing units are not at any risk of falling and hurting themselves in the showers.

Defendant Cobble is being sued in their official capacity for injunctive relief, and in his individual capacity for monetary damages[60].

**Claim Three:** The Defendants have known since the decision was issued by the Middle District of Tennessee, Nashville Federal District Court in Grubbs v. Bradley, 552 F. Supp. 1052 (M.D. Tenn. 1982) [61]that housing inmates with higher custody levels in the same units with inmates with lower custody levels, and violent inmates with non-violent inmates in the same housing units places the lower custody inmates and non-violent inmates at risk of being harmed.

---

[59] The monetary damages are for those issues in paragraphs 20, 21, and 24 of Claim One
[60] The monetary damages are for those issues in paragraphs 27 and 29 of Claim Two.
[61] *Grubbs addressed among other things the unconstitutional housing conditions in TDOC.*

26

The Defendants have known that the Plaintiff is a member of an identifiable group who is at substantial risk of being physically harmed, because of his prior high profile communications with law enforcement, his FDC IRMS designation as "Identified Prey", and his TDOC PREA System designation as a "Victim," and they have not taken any action to correct the unconstitutional housing conditions in Building 25 and in Team Five, nor have they granted any of the Plaintiff's requests or grievances to move to BCCX Site Two.

The Defendants have also known that in Team Five and in Building 25 at BCCX Site One, inmate attacks have been longstanding, pervasive, well documented, and expressly noted by prison officials, that they have a constitutional and statutory obligation to protect the Plaintiff from harm, and that he does not have any restrictions prohibiting him from being moved to BCCX Site Two. While knowing these things, the Defendants have continued to not take any action to move the Plaintiff to BCCX Site Two, where inmate attacks have not been longstanding, pervasive, well documented, and expressly noted by prison officials[62] until the Plaintiff is physically or sexually harmed.

The Defendants have also continued to engage in an unconstitutional practice of not moving any inmate who could be at substantial risk of being physically harmed from BCCX Site One to BCCX Site Two unless they are physically or sexually assaulted / battered.

Defendants TDOC, Strada, and Cobble are being sued in their official capacities for injunctive relief, and Defendants Cobble and Strada are being sued in their individual capacities for monetary damages[63]. U.S. Const., 8th Amend.; Zakora v. Chrisman, 44 F. 4th 452 (6th Cir. 2022); Farmer v. Brennan, 114 S. Ct. 1070 (1994); Helling v. McKinney, 113 S. Ct 2475 (1993); Westmoreland v. Butler County, Kentucky, 29 F.4th 721 (6th Cir. 2022); Comstock v. McCrary, 273 F.3d 693 (6th Cir. 2001); Street v. Corr. Corp. of Am., 102 F.3d 810, 815 (6th Cir. 1996); Marsh v. Arn, 937 F.2d 1056, 1061 (6th Cir. Cir. 1991).

---

[62] While BCCX Site Two is considered the safest prison in TDOC, Turney Center, Lois M. DeBerry Special Needs Facility and, Riverbend are also considered to be the next three safest TDOC prisons.
[63] The monetary damages are for those issues in paragraphs 64 and 65 of Claim Three.

27

**Claim Four:** TDOC has a statewide pattern and practice of not taking any steps to prevent inmates who are members of identified groups[64] that are at risk of being physically or sexually harmed from being housed in extremely violent locations like Team Five at BCCX Site One, where inmate attacks have been longstanding, pervasive, well documented, and expressly noted by prison officials. Monell v. Department of Social Services of City of New York, 98 S.Ct. 2018 (1978).

TDOC does not have a policy that explains / gives guidance on how and where inmates who are members of identifiable groups who are at a substantial risk of being physically harmed, should be housed in general population locations in TDOC.

TDOC does not have a policy that explains / gives guidance on what general population prisons inmates who are members of identifiable groups who are at a substantial risk of being physically harmed should be housed in general population in TDOC[65].

While TDOC does house inmates who are members of identifiable groups who are at substantial risk of being physically or sexually harmed at BCCX Site Two, currently there are inmates who are members of identifiable groups, other than the Plaintiff who are currently housed in Team Five at BCCX Site One.

The Defendants and all of the staff at BCCX consider a move from BCCX Site One to BCCX Site Two, or from BCCX Site Two to BCCX Site One to be a cell change and not a transfer. This is because BCCX Site One classified inmates obtain a move to BCCX Site Two the same way that they obtain a cell change to the cell next to them, which is by submitting a cell change request to unit management for the Team they are housed in[66].

Plaintiff is a minimum custody, non-violent offender, who is listed as a "Victim" on TDOC's PREA System, he has no incompatibles, and his medical files show that he does not have any Medical – B restrictions or ADA accommodations requiring him to be housed in a

---

[64] Former law enforcement officials, former high-profile informants, transgenders, young petite inmates, and high-profile inmates like the Plaintiff who have received substantial media attention referencing their cooperation with federal law enforcement officials.

[65] While BCCX Site Two is considered the safest prison in TDOC, Turney Center, Lois M. DeBerry Special Needs Facility and, Riverbend are also considered to be the next three safest TDOC prisons.

[66] The final decision is made by the Warden, who sub judice is Defendant Cobble.

handicap cell or at BCCX Site One. In other words, he does not have any restrictions prohibiting him from being moved or housed at BCCX Site Two.

It is the common practice of Defendant Cobble and BCCX staff to move all minimum custody inmates who are from Tennessee and who are housed in Building 25 at BCCX Site One to BCCX Site Two unless they have some type of restriction prohibiting them from being housed at BCCX Site Two.

Over the last several years, the Plaintiff has submitted several cell change requests and grievances requesting to be moved to BCCX Site Two.

Defendants TDOC, Strada, and Cobble are being sued in their official capacities for injunctive relief.; Farmer v. Brennan, 114 S. Ct. 1070 (1994); Helling v. McKinney, 113 S. Ct 2475 (1993).

**Claim Five:** Defendant Cobble denied the Plaintiff his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) (42 U.S.C. § 2000-CC), the Free Exercise and Equal Protection Clauses of the First and Fourteenth Amends. of the U.S. Const. by subjecting the Plaintiff to unconstitutional housing conditions that impede on his ability to practice his faith as a Protestant Reformed Christian.

Defendants TDOC, Strada, and Cobble are being sued in their official capacities for injunctive relief, and Defendant Cobble is being sued in their individual capacity for monetary damages[67].

**Claim Six:** Defendant Cobble has denied the Plaintiff his Eighth Amendment U.S. Constitutional right to protection from Alexander Friedmann, who Cobble knew had a history of engaging in paper terrorism tactics against TDOC staff and of trying to get inmates to physically harm inmates who oppose him / Friedmann. U.S. Const., 8th Amend.; Farmer v. Brennan, 114 S.Ct. 1070 (1994).

Defendant Cobble is being sued in his official capacity for injunctive relief.

### Statement of Damages

---

[67] The monetary damages are for those issues in paragraphs 75 of Claim Five.

Wherefore the Plaintiff requests that this Honorable Court grant the following relief:

A. Issue injunctions ordering:

**Claim One**

1. Defendant Cobble to take reasonable steps to stop / correct the unconstitutional K-2 conditions in Team Five and in Building 25; and

2. the Plaintiff be moved to Bledsoe County Correctional Complex (BCCX) Site Two where there are several housing units that do not have the K-2 problems that exist in Unit 25B and in every BCCX Site One housing unit.

**Claim Two**

3. the Defendants provide a structural design to the shower stalls in Unit 25B making it where inmates who are in the shower stalls and showering cannot see the faces of the inmates who are on the upper tier and stairs in front of the showers looking / watching the inmates who are showering;

4. the Defendants take reasonable steps to correct / stop the voyeurism activities in Building 25 and more than likely in all of the BCCX Site One housing units that are creating the ADA, Section 504, and PREA issues in said unit (s); and

5. the Plaintiff be moved to BCCX Site Two where inmates do not have the ability to watch other inmates while they shower in any of the housing units.

**Claim Three**

6. the Defendants to stop housing minimum custody inmates in the same housing units with medium custody inmates, and close custody inmates who have been given custody overrides to medium custody in Building 25;

7. the Defendants to stop housing violent and non-violent inmates in the same housing units in Building 25;

8. the Defendants to stop housing inmates who are confirmed gang members with inmates who are not gang members in the same housing units in Building 25;

30

9. The Defendants to stop housing inmates who have excessive disciplinary histories in the same housing units with inmates who have no disciplinary convictions in years;

10. the Defendants take reasonable steps to stop / correct the conditions in Team Five and in Building 25 that have caused the inmate attacks that have been longstanding, pervasive, well documented, and expressly noted by prison officials;

11. The Defendants to move all minimum custody inmates who are housed in Building 25 to BCCX Site Two and or BCCX Annex where the remainder of the minimum custody inmates who are classified to BCCX are housed; and

12. the Plaintiff be moved to BCCX Site Two where he qualifies to be moved / housed, and where he can be safely housed and be at no risk of harm[68].

**Claim Four**

13. Defendant Strada to enact a policy that explains / gives guidance on how and where inmates who are members of identifiable groups who are at a substantial risk of being physically harmed, should be housed in general population locations in TDOC where inmate attacks have not been longstanding, pervasive, well documented, and expressly noted by prison officials;

14. the Defendants take reasonable steps to stop / correct the conditions in Team Five and in Building 25 that have caused the inmate attacks that have been longstanding, pervasive, well documented, and expressly noted by prison officials; and

15. the Plaintiff be moved to BCCX Site Two where he qualifies to be moved / housed, and where he can be safely housed and be at no risk of harm[69].

**Claim Five**

16. the Defendants to stop housing minimum custody inmates in the same housing units with medium custody inmates, and close custody inmates who have been given custody overrides to medium custody in Building 25;

---

[68] While BCCX Site Two is considered the safest prison in TDOC, Turney Center, Lois M. DeBerry Special Needs Facility and, Riverbend are also considered to be the next three safest TDOC prisons.
[69] While BCCX Site Two is considered the safest prison in TDOC, Turney Center, Lois M. DeBerry Special Needs Facility and, Riverbend are also considered to be the next three safest TDOC prisons.

31

17. the Defendants to stop housing violent and non-violent inmates in the same housing units in Building 25;

18. the Defendants to stop housing inmates who are confirmed gang members with inmates who are not gang members in the same housing units in Building 25;

19. the Defendants take reasonable steps to stop / correct the conditions in Team Five and in Building 25 that have caused the inmate attacks that have been longstanding, pervasive, well documented, and expressly noted by prison officials; and

20. the Plaintiff be moved to BCCX Site Two where he qualifies to be moved / housed, and where he can be safely housed and where he can practice his faith as a Protestant Reformed Christian.

**Claim Six**

21. the Defendants to take appropriate steps against Inmate Alexander Friedmann; and

22. the Plaintiff be moved to BCCX Site Two where he qualifies to be moved / housed, and where he can be safely housed and be at no risk of being harmed by any attempts made by Friedmann.

B. An award of nominal, compensatory, and punitive damages from each Defendant for each claim that they are being sued for.

C. An award for filing fees, cost, and expenses.

D. Such other relief as this Honorable Court deems equitable and just.

<strong>Unnotarized Oath</strong>

Under penalty of perjury, I swear that everything stated herein is true and correct.

Executed on this 2o day of April 2026.

By: _Harold Hempstead_

Harold Hempstead, # 577366

Bledsoe County Correctional Complex

1045 Horsehead Road

Pikeville, Tennessee 37367

Harold Hempstead, Inm #511366
Bledsoe County Correctional Complex
1045 Horsehead Road
Pikeville, Tennessee
                    37367



RECEIVED
APR 27 2026
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

U.S. District Court
Nashville Division
Attn: Clerk of the Court
Fred D. Thompson U.S. Courthouse
~~Office Building~~
719 Church Street, Ste. 1300
Nashville, Tennessee
                    37203



THE DEPARTMENT OF CORRECTIONS
BCCX HAS NEITHER INSPECTED
NOR CENSORED AND IS NOT
RESPONSIBLE FOR THE CONTENTS

Received

APR 21 2020

BCCX Mailroom
Outgoing

INSPECTED BY:

DATE: